UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| LARRY HAMLET, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:19-cv-00028 |
| | ) |
| LINDA KEY, in her individual capacity; | ) |
| DYLAN ASHLOCK, in his individual | ) |
| capacity: and OVERTON COUNTY, | ) |
| TENNESSEE | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Pending before the Court in this civil rights action under 42 U.S.C. § 1983 are the fully-briefed Motions for Summary Judgment filed by Dylan Ashlock and Overton County, Tennessee (Doc. No. 39), and by Linda Key (Doc. No. 43). Also pending is a Joint Motion to Amend (Doc. No. 35) filed by all Defendants. For the reasons that follow, (1) the Joint Motion to Amend will be denied; (2) Key's Motion for Summary Judgment will be granted; and (3) the Motion for Summary Judgment filed by Ashlock and Overton County will be granted only as it pertains to Overton County, leaving Ashlock as the sole remaining Defendant in this case.

### I. Factual Background

The relevant facts, mostly undisputed, are as follows:

Ashlock is an Overton County, Tennessee deputy sheriff who, throughout his tenure, has completed the forty hours of in-service training required annually for state police certification. He also serves as a school resource office and has completed additional training for that position. Key is a social worker with the Tennessee Department of Children's Services ("DCS"), whose

responsibilities include investigating allegations of child abuse.

On March 23, 2018, DCS received a complaint from a school counselor of potential child abuse regarding Larry Hamlet's son, a five-year-old student at Hilham Elementary School. Based upon the nature of the complaint, Key decided a home visit was necessary and requested that Deputy Ralph Mayercik, the school resource officer at Hilham, accompany her.[1] Upon arriving at what was thought to be Hamlet's residence, the pair discovered that the home was vacant. They then decided that contact would be made with the parents when the child was picked up from school later that afternoon.

Deputy Ashlock went to the school early to identify the child in question. Although he did not know Hamlet personally, Deputy Ashlock was told Hamlet "was a hothead." (Doc. No. 50, Ashlock's Statement of Facts at ¶ 15). Accordingly, Deputy Ashlock decided that it would be best to hold the child at the school until the other children were released to their parents, so as to minimize any disruption or potential confrontation. (Id. ¶ 14).

Deputy Ashlock waited inside the school with Key while the other children were released. Meanwhile, Amy Anderson, the child's mother, was outside the school waiting for her son. When her son did not appear with the other children, Anderson asked his teacher about him. Key and Deputy Ashlock then stepped outside to speak with Anderson.

Key told Anderson that she was investigating a complaint received by DCS, and that she needed to do a home visit and interview both Anderson and Hamlet. As Key was speaking with Anderson, Hamlet approached and was told by Deputy Ashlock about the investigation and the need

---

[1]The parties dispute whether the home visit occurred on March 26, 2018 or April 2, 2018. This dispute is immaterial, except to the extent that it bears on a potential statute of limitations defense, which is the subject of the pending motion to amend that is discussed below.

for a home visit.

Although Deputy Ashlock vigorously denies it, Hamlet claims that he asked whether a warrant was needed for the home visit. According to Hamlet, Deputy Ashlock stated, "if you want to keep your kid, you'll let us come search your house." (Id. at ¶ 26). Hamlet then asked Key if this was true, to which she responded, "I'm afraid so." (Id. at ¶ 27). As an Army veteran and having read books on constitutional law, Hamlet claims that he knew a few of his constitutional right, and knew they needed a warrant, but states that, when he told Deputy Ashlock a warrant was needed, he reiterated that "if you want to keep your kid, you'll let us come search your house." (Id. at ¶ 28).

Hamlet provided Deputy Ashlock with his home address, but said that he needed to stop and get some gas first. Key and Deputy Ashlock (in one car) followed Hamlet, Anderson and their son (in another car) to the gas station and then to residence. Upon arrival, Anderson went into the house first and the others followed. However, prior to entering the residence, Hamlet claims that he asked again whether a warrant was needed, but was told by Deputy Ashlock that if he wanted to keep his son he would allow them to search, or words to that effect. Hamlet then stood back and allowed Deputy Ashlock and Key to enter. At no time did either Deputy Ashlock or Key threaten or use physical force when seeking consent for the home visit.

Upon entering the home, Deputy Ashlock saw a baby on the floor and was told by Anderson that it was her grandchild. Deputy Ashlock, who had just had a second child, sat on the couch and played with the baby while Key began her interview of Anderson and Hamlet. Because Hamlet continued to interrupt and began to dominate the conversation, however, Key asked him to step outside while she finished interviewing Anderson alone. Key then interviewed Hamlet before leaving the residence with Deputy Ashlock.

3

Deputy Ashlock did not conduct any interviews, or investigate the matter for criminal charges. Key's sole involvement in the alleged constitutional violation occurred when she said, "I'm afraid so," after Deputy Ashlock told Hamlet that "if you want to keep your kid, you'll let us come search your house." (Doc. No. 47, Key's Statement of Fact ¶ 2).

Prior to this lawsuit, Overton County had received no other complaints of misconduct pertaining to Deputy Ashlock, nor had it been made aware of any other deputies unlawfully entering the residence of Overton County citizens. (Doc. No. 50, Ashlock's Statement of Fact ¶ 6).

## II. Legal Discussion

This is the second time the Court has been called upon to address substantive issues in this case. The first time around, it was in the context of a motion to dismiss filed solely by Key where the standard required only that Hamlet provide "enough facts to state a claim [for] relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In the context of the presently pending motions summary judgment however, the allegations in the complaint are largely irrelevant because "[o]nce the moving party has identified what it believes shows an absence of a genuine dispute of material fact, the nonmoving party must 'go beyond the pleadings and by h[is] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " Santiago v. Ringle, 734 F.3d 585, 589 (6th Cir. 2013). The difference in the procedural posture of the case now leads the court to conclude that Key is entitled to dismissal from the case, although the same cannot be said for Deputy Ashlock. First, however, the Court must address the Motion to Amend because it is potentially outcome-determinative.

**A. Joint Motion to Amend**

Defendants move to amend their Answers to the Complaint to add a statute of limitations defense. They claim that, in preparing their respective Motions for Summary Judgment, counsel discovered for the first time that the actual interaction between Deputy Ashlock, Key and Hamlet was on March 26, 2018, and not on April 2, 2018 as alleged in the Complaint. As a consequence, the Complaint – filed on April 1, 2019 – is untimely. See Sharpe v. Cureton, 319 F.3d 259, 266 (6th Cir. 2003) ("Tennessee law provides for a one year statute of limitations for § 1983 actions.").

A court should grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, *etc.* – the leave sought should, as the rules require, be 'freely given.'" Pittman v. Experian Info. Sols., Inc., 901 F.3d 619, 640 (6th Cir. 2018) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

"Although Rule 15(a) indicates that leave to amend shall be freely granted, a party must act with due diligence if it intends to take advantage of the Rule's liberality." United States v. Midwest Suspension & Brake, 49 F.3d 1197, 1202 (6th Cir. 1995) (citation omitted). Nevertheless, there must be "'at least some significant showing of prejudice' to deny a motion to amend based solely upon delay." Prater v. Ohio Educ. Ass'n, 505 F.3d 437, 445 (6th Cir. 2007) (quotation omitted). "The longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." Phelps v. McClellan, 30 F.3d 658, 662 (6th Cir. 1994).

Furthermore, where, as here, a scheduling order has been entered and the deadline for the

5

amendment of pleadings has passed, the party seeking leave to amend "first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a)." Leary v. Daeschner, 349 F.3d 888, 909 (6th Cir. 2003). "[I]n addition to Rule 16's explicit 'good cause' requirement, . . . a determination of the potential prejudice to the nonmovant also is required when a district court decides whether or not to amend a scheduling order." Id.

Defendants have not shown good cause to amend the scheduling order in this case and the prejudice to Hamlet is apparent. Under the case management order, motions to amend were to be filed on or before November 18, 2019, yet Defendants did not file their motion to amend until August 14, 2020, which was the deadline for the filing of dispositive motions. Between those two dates, discovery has been conducted and completed, and Hamlet has had to defend against a motion to dismiss that did not raise a statute of limitations defense. Moreover, in his Answer (Doc. No. 7 ¶ 8), Deputy Ashlock "admit[ted] that Defendants Key and Ashlock approached Amy Anderson at Hilham Elementary School as alleged," with the allegation in the Complaint being that this occurred on April 2, 2018. Further, in the Initial Case Management Order, Defendants affirmatively stated, as a part of their theory of the case, that "[o]n April 2, 2018, Deputy Dylan Ashlock was requested to accompany Defendant Key for a home inspection by DCS." (Doc. No. 18 at 2).

Rule 16 was designed to ensure that "at some point both the parties and the pleadings will be fixed." Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. "Plaintiffs can demonstrate 'good cause' for their failure to comply with the original schedule[] by showing that despite their diligence they could not meet the original deadline." Leary, 349 F.3d at 907.

Defendants have not shown diligence here. Instead, Defendants "discovered" the actual date

6

of the incident when they reviewed a "report from 9-1-1 Communication Center for Overton County" while preparing their Motions for Summary Judgment. (Doc. No. 36 at 2). This is something that could have, and should have, been reviewed much earlier in the proceedings. Moreover, were the Court to allow the Answers to be amended, discovery would likely have to be reopened because, while the Communication Center records report the date as being March 23, a report of the incident prepared by Deputy Ashlock on July 5, 2018 indicates that the home visit occurred on April 2, 2018. (Doc. No. 42-2 at 5). Accordingly, the Motion to Amend will be denied.

**B. Motions for Summary Judgment**

Deputy Ashlock and Key move for summary judgment on the grounds that Hamlet has failed to establish a violation of his constitutional rights and that, even if he had, they are entitled to qualified immunity. Overton County moves for summary judgment on the grounds that, without a constitutional violation, it cannot be held liable and that, regardless, Hamlet has failed to establish a claim for failure to train or supervise, or that a custom or policy of Overton County led to the violation of his constitutional rights. After setting forth the generally applicable law, the Court addresses the specific argument raised by Defendants in turn.

Hamlet brings his claims under 42 U.S.C. § 1983, which provides a cause of action against any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" Thus, to establish his claim, Hamlet "must show that (1) a person acting under color of law (2) deprived him of his rights secured by the United States Constitution or its laws." Neuens v. City of Columbus, 303 F.3d 667, 670 (6th Cir. 2002) (citing O'Brien v. City of Grand Rapids, 23 F.3d 990, 995 (6th Cir.1994)). Here, Deputy Ashlock and Key admit that they

7

were acting under color of state law when they encountered Hamlet on April 2, 2018, and so the only question is whether Hamlet was deprived of a constitutional right.

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "'basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018 (quoting Camara v. Mun. Ct. of City and City of San Francisco, 387 U.S. 523, 528 (1967)). Accordingly, "[i]t is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Id. (citing Davis v. United States, 328 U.S. 582, 593-594 (1946)).

Here, Defendants claim that Hamlet freely consented to a search of his residence and that Hamlet never inquired about the need for a warrant. Hamlet's version of events is much different. "At the summary-judgment stage, of course, [the Court] must view the record 'in the light most favorable to the nonmoving party,' and [it] "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial.'" Lowe v. Walbro LLC, ___ F.3d ___, ___, 2020 WL 5033418, at *4 (6th Cir. Aug. 26, 2020) (quoting Laster v. City of Kalamazoo, 746 F.3d 714, 726 (6th Cir. 2014)). Consequently, the Court must accept Hamlet's

8

version of the facts, and consider the defense of qualified immunity raised by both Deputy Ashlock and Key.

When the defense of qualified immunity is asserted, "plaintiff has the burden of showing that a right is clearly established." Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009). " 'For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holzemer v. City of Memphis, 621 F.3d 512, 527 (6th Cir. 2010) (quoting, Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007) ). "'A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point.'" Id. (quoting Risbridger v. Connelly, 275 F.3d 565, 569 (6th Cir. 2002)).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011), "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))

### 1. *Deputy Ashlock*

Applying the above principles to Deputy Ashlock, the Court finds that he is not entitled to summary judgment based upon the present record. This is because questions of fact exist not only as to whether he was asked about whether a warrant was needed, but also because there is a question as to whether consent was given.

"An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." Pearson v. Callahan, 555 U.S. 223, 243-44 (2009). "This inquiry turns on the 'objective legal reasonableness of the action, assessed

9

in light of the legal rules that were clearly established at the time it was taken.'" Wilson v. Layne, 526 U.S. 603, 614 (1999)).

As already noted, consent to search is a recognized exception to the Fourth Amendment's warrant requirement. However, to be valid "the consent to search must be 'voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" Andrews v. Hickman Cty., 700 F.3d 845, 854 (6th Cir. 2012) (quoting United States v. Canipe, 569 F.3d 597, 602 (6th Cir.2009)). "'[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.'" Clemente v. Vaslo, 679 F.3d 482, 489 (6th Cir. 2012) (quoting Schneckloth, 412 U.S. at 227). "This includes considering the characteristics of the individual giving consent, such as 'age, intelligence, and education'; whether the questioner engaged in 'coercive or punishing conduct'; and the presence of 'more subtle forms of coercion that might flaw an individual's judgment.'" Id. (quoting United States v. Beauchamp, 659 F.3d 560, 572 (6th Cir.2011) (alteration, citations, and internal quotation marks omitted). "'The government bears the burden of proving, through clear and positive testimony[,] that the consent to search was given voluntarily.'" Id.

Based upon the summary judgment record, Deputy Ashlock has failed to establish that Hamlet freely and voluntarily consented to a search of his home. If Hamlet is to be believed, Deputy Ashlock informed him on at least three separate occasions that if Hamlet refused to consent, his children would be taken away. If true, this was an outright falsehood because "it was clearly established that Fourth Amendment warrant requirements . . . apply to the removal of children from their homes by [both police] and social workers." Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs., 724 F.3d 687, 699 (6th Cir. 2013).

10

Case 2:19-cv-00028   Document 57   Filed 09/30/20   Page 10 of 15 PageID #: 797

Furthermore, Deputy Ashlock has pointed to nothing in the record about the "characteristics of the individual giving consent," other than to suggest that Hamlet understood his constitutional rights. A review of the excerpts from Hamlet's deposition that have been submitted by Deputy Ashlock suggests that Hamlet is not the constitutional scholar that Deputy Ashlock's statement of facts make him out to be. Instead, Hamlet stated that, being "ex-army" he "kn[e]w a few amendment rights," and that, in response to the question, "so you read a lot of books on constitutional law?," he merely replied, "Just in general, I used to read as a hobby." (Doc. No. 42-3, Hamlet Depo. at 97, 167 & 181). He also testified that he felt coerced because Deputy Ashlock (1) was aggressive; (2) "was the man, you going to do what he says, when he says it, and how he says you do it"; (3) guarded him like he "was a prisoner" when he stopped to get gas; and (4) tailgated him when they traveled from Overton County where the school was located to Clay County where Hamlet lived. (Id. at 97, 166-67).

It will be for the jury to determine whether Hamlet was coerced, or whether he gave consent freely and voluntarily. It will also be for the jury to weigh whether, as Defendants claim, Deputy Ashlock "was simply providing Plaintiff with a rough outline of likely legal and law enforcement proceedings in light of the abuse allegation," (Doc. No. 44 at 6, n.2), when he told Hamlet, "if you want to keep your kid, you'll let us come search your house." (Doc. No. 50, SOF at ¶ 26).

### 2. Linda Key

Turning to Hamlet's Section 1983 claim against Key, the Court finds summary judgment to be appropriate. The only – and undisputed – evidence is that Key (1) simply stated, "I'm afraid that's so," after Deputy Ashlock made the statement to Hamlet about keeping his son; and (2) Key entered

11

the residence after the door was left open by Anderson.

To be sure, at the time of the events in question, the Sixth Circuit had clearly established that "a social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement," meaning "that social workers would have to obtain consent, have sufficient grounds to believe that exigent circumstances exist, or qualify under another recognized exception to the warrant requirement before engaging in warrantless entries and searches of homes." Andrews v. Hickman Cty., 700 F.3d 845, 859–60 (6th Cir. 2012). However, when making that pronouncement in Andrews, the Sixth Circuit went on to observe that "[w]hen social workers rely in good faith on information from police officers which suggests they can enter a home under an exception to the warrant requirement, or can reasonably infer that an exception applies from their actions, they are entitled to rely on that information." Id. at 864. In fact, it was on the basis that only discovery would reveal whether Key was acting in good faith by simply following Deputy Ashlock's lead that the Court denied her Motion to Dismiss. Now that discovery has been completed, Hamlet has adduced insufficient evidence from which a jury could find in his favor.

Hamlet does not claim that Key was aggressive towards him, or that she was a driving force that led to Hamlet allowing entry into the home. In his deposition in response to the question, "how do you say that Ms. Key coerced you to enter the house?," Hamlet merely stated, "[w]ell, she was beside Officer Ashlock and she agreed with everything he said." (Doc. No, 45-1 at 90). This suggest little more than passive involvement, which is not enough to establish liability for the deprivation of a constitutional right. See, Alexander v. Carter ex rel. Byrd, 733 F. App'x 256, 267 (6th Cir. 2018) (stating that in the absence of a showing of direct responsibility, "an officer's 'mere presence' at the scene of an arrest fails to establish § 1983 liability"; Bey v. Falk, 946 F.3d 304, 315 (6th Cir.

2019) ("[M]ere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability."); Burgess v. Fischer, 735 F.3d 462, 475 (6th Cir. 2013) (stating that officers' "mere presence during [an] altercation" where other officers used excessive force, "without a showing of some direct responsibility, cannot suffice to subject them to liability.").

"Of course, even if [Key]'s belief that [s]he was a mere bystander was mistaken, [s]he is still entitled to qualified immunity on this ground if h[er] mistake was reasonable." Haywood v. Hough, 811 F. App'x 952, 960 (6th Cir. 2020). And because "'it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts' in cases implicating the Fourth Amendment, [Key] can only be denied qualified immunity if there is controlling precedent involving materially similar facts in which courts have found consent to be involuntarily given." Harris v. Klare, 902 F.3d 630, 642 (6th Cir. 2018) (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018))

Hamlet points to no such authority. Instead, he relies on United States v. Ivy, 165 F.3d 397 (6th Cir. 1998) and United States v. Crowder, 62 F.3d 782 (6th Cir. 1995), which he claims "put Ms. Key on notice that threatening to take a child into state custody is an unacceptable means of obtaining consent to search." (Doc. No. 46 at 4). However, both cases are inapposite –they were criminal cases where neither personal responsibility nor qualified immunity under Section 1983 were at issue. Moreover, the Sixth Circuit in Crowder said no such thing because the claim there was that defendant felt coerced because officers threatened to arrest his girlfriend even though, as a factual matter, they did not. As for Ivy, it presented much more egregious conduct, specifically a 1 ½ hour gap between the time officers first sought defendant's consent to search, and the signing of the consent form during which time his girlfriend was handcuffed to the table, officers took the child

13

away from her, and threatened to take the child into custody if defendant did not consent. Key's conduct, *i.e.*, simply agreeing with Deputy Ashlock's statement, pales by comparison. In any event, Key's "actions fall near enough to the 'hazy' border separating illegal from legal conduct for qualified immunity to attach." Bing v. City of Whitehall, Ohio, 456 F.3d 555, 571 (6th Cir. 2006) (Brosseau v. Haugen, 543 U.S. 194, 201 (2004).

### 3. *Overton County*

Overton County's Motion for Summary Judgment requires little discussion given Hamlet's response. The entirety of his argument is as follows:

> Overton County insists that Mr. Hamlet cannot show a custom or policy of the county that caused the plaintiff's injury, because he cannot show that the county has delegated final policy-making authority to an individual with regard to the alleged constitutional violation. However, these defendants point to no undisputed fact to support this assertion.

(Doc. No. 49 at 6).

There are many problems with Hamlet's argument, not the least of which is that it is not incumbent upon Overton County to prove a negative, *i.e.*, it did not have a policy or custom that allowed its officers to violate constitutional rights in the manner alleged by Hamlet. Rather, "[t]o succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights." Miller v. Sanilac Cty., 606 F.3d 240, 254–55 (6th Cir. (2010) (citing Powers v. Hamilton County Pub. Defender Comm'n, 501 F.3d 592, 606–07 (6th Cir.2007)). Hamlet has not identified any custom or policy, let alone shown that the custom or policy was a driving force behind the search at issue.

Nor has Hamlet make any effort to establish his failure to train claim, which requires a

14

showing of "'deliberate indifference to the rights of persons with whom the police come into contact.'" Id. (quoting Slusher v. Carson, 540 F.3d 449, 457 (6th Cir.2008) "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" Id. (quoting Fisher v. Harden, 398 F.3d 837, 849 (6th Cir.2005)). Hamlet has identified no such instance. All the summary judgment record shows is that Deputy Ashlock has maintained his police certification throughout his employment, and has received additional training as a school resource officer.

**III. Conclusion**

On the basis of the foregoing, summary judgment will be granted in favor of Key and Overton County, but denied as to Deputy Ashlock. The motion to amend filed by all defendants will be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE